IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:

SPRINGBOARD MEDIA, LLC,
A Florida limited liability company

      Plaintiff,

v.

AUGUSTA HITECH SOFT SOLUTIONS
LLC, a Texas limited liability company,

      Defendant.

_____/

## COMPLAINT

Plaintiff, **SPRINGBOARD MEDIA, LLC** ("**Plaintiff**" or "**Springboard**"), sues Defendant, **AUGUSTA HITECH SOFT SOLUTIONS LLC**, ("**Defendant**" or "**Augusta**") and in support thereof, states as follows:

## PRELIMINARY STATEMENT

1.      This is an action for monetary damages and equitable relief stemming from Defendant's breaches of contract and tortious conduct, related to the development of a web and mobile application and includes claims for breach of fiduciary duty, tortious interference with contract and prospective economic advantage, civil conspiracy, injurious and negligent falsehood, fraudulent misrepresentation, fraud, trade secret misappropriation, unfair competition, violation of the Florida Uniform Trade Secrets Act and the Florida Deceptive and Unfair Trade Practices Act, and unjust enrichment.

## PARTIES, JURISDICTION AND VENUE

2.      Plaintiff, SPRINGBOARD MEDIA, LLC, is a Florida limited liability company with its principle place of business in Florida.

3.      Defendant, AUGUSTA HITECH SOFT SOLUTIONS LLC, is a Texas limited liability company with its principal place of business in Texas. Defendant markets itself as an end-to-end application development service provider who delivers, among other things, "application development services from design to implementation [] [and it's] experts will deliver your product on time and on budget."

4.      This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332, as this case involves an action by a limited liability company that is a citizen of Florida and a limited liability company that is a citizen of Texas, and the amount in controversy is more than seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

5.      Venue is proper in Miami-Dade County as Defendant agreed that the venue for any dispute arising from its agreement with Plaintiff would be Miami-Dade County.

## GENERAL ALLEGATIONS

A.      **Introduction**

6.      Plaintiff engaged Defendant to assist in the time-sensitive and confidential development of an application for a sports-centric social media platform for connecting professional athletes, brands, and sports enthusiasts that allows users to build a brand and show their preferred equipment and accessories.

7.      Defendant was selected by Plaintiff due to its representations that its executives have over 25 years of experience with technical knowledge spanning multiple industries and its marketed expertise in technological development, project management, technical documentation, cloud infrastructure, prototyping, migration and security.

8.      Specifically, Defendant represented that it is "one of the top 20 global software engineering firms" and that Defendant has won an innovation award for its Cancer Blockchain technology.

9.      On or about August 21 2019, Plaintiff and Defendant began discussions for the development of a project known as "GER MVP Product Development" (the "Project").

10.     On August 22, 2019 Defendant's CEO, Karthik Pichai, signed a non-disclosure agreement pursuant to which Defendant agreed to confidentiality and non-disclosure with respect to its work on, and information learned in relation to, the Project ("NDA"). A true and correct copy of the NDA is attached as **Exhibit "A."**

11.     On or about November 25, 2019, the parties entered into a Consulting Services Agreement (the "Agreement") for computer software for the Project. A true and correct copy of the Agreement is attached as **Exhibit "B."**

**B.      Contractual Obligations**

12.     Pursuant to the Agreement, and in exchange for substantial payments by Plaintiff, Defendant agreed to build/develop and provide as per schedule B of the Agreement:

    a.  Mobile application; Progressive web app; Web portal; Backoffice for user management, admin management, and basic reports (collectively "**Deliverables**");

    b.  Software architecture; Hardware architecture; Database architecture (collectively "**Architecture**");

    c.  Business analysis and production environment; Project manager; UI/UX Design team and designs; UI engineer; iOS and Android team; Full stack API team; Database developer; Infrastructure team; and Quality and assurance team (collectively "**Teams**").

13.     Pursuant to the Agreement, Defendant agreed to specific processes in completing the Deliverables, Architecture, and work of the Teams as per Schedule B of the Agreement. These processes include (collectively "**Means and Methods**"):

a.  Application of Industry Standards (hereinafter "**Industry Standards**") including but not limited to:

   i.   Review of latest coding standards and trends and code commenting; and

   ii.  User interface design consistency and clear and concise unit testing

b.  Streamlined Project Management (hereinafter "**Project Management**") including but not limited to:

   i.   Tracking and submission of all tasks, bugs and issues; and

   ii.  Complete visibility of project status and notification alerts

c.  Application of DevOps (hereinafter "**DevOps**") including but not limited to:

   i.    SonarCube scans;

   ii.   Source code version control; and

   iii.  Continuous testing

d.  Detailed Technical Documentation (hereinafter "**Documentation**") including but not limited to:

   i.    Business executive summary of product outcome;

   ii.   Software requirements specification;

   iii.  Software and hardware design stacks; and

   iv.   Security architecture review and analysis

e.  Prototyping by UI/UX designers (hereinafter "**Prototypes**") including but not limited to:

4

      i.  Client review of the products on mobile devices and user experience; and

      ii.  User acceptance testing for automation, security, coding compliance, and performance

  f.  Testing through Sprints (hereinafter "**Sprints**") including but not limited to:

      i.  Client review and sign off on design;

      ii.  Project status reports; and

      iii.  User acceptance testing and quality assurance testing

14.    The Agreement provided for deployment of the application and/or software to the cloud infrastructure solution of Plaintiff's choice, Oracle.

15.    Additionally, provisions 1 and 3 of the Agreement require Defendant to provide progress reports upon Plaintiff's request, and submit modification quotes reflecting changes to price, payment deadlines, deliverable timelines and other relevant information.

16.    The Agreement makes clear that time is of the essence.

17.    Of paramount importance, provision 11 of the Agreement requires Defendant to maintain the strictest of confidentiality with respect to trade secrets, inventions, innovations, processes, information, records and specifications, letters, notes, and all other information/documents made accessible to Defendant during the engagement. This contractual provision also required any advisors, developers, etc. selected by Defendant to provide services under the Agreement to execute a confidentiality agreement.

**C.**    <u>**Breaches of Contractual Obligations**</u>

18.    Defendant materially breached provisions 1 and 3 of the Agreement by, among other things, failing to provide Modification Quotes, failing to provide a confidential final written report, and providing materially false progress reports.

19.     Additionally, Defendant materially breached provisions in schedule B of the Agreement by, among other things:

    a.   Failing to complete the Deliverables including the Backoffice application, Web application, and Mobile application;

    b.   Failing to properly develop the Architecture, including providing false set-up reports and failing to consult with Plaintiff;

20.     Defendant materially breached the Means and Methods in schedule B of the Agreement by, among other things:

    a.    Triggering a user acceptance testing warranty without having completed the Deliverables in final, completed form;

    b.   Failing to follow proper security protocols and testing including leaving all development and links applying to both iOS and Android public when required to by private;

    c.   Improper DevOps application including failure to use SonarCube scans;

    d.   Improper deployment to the cloud server including:

        i.   Overwriting changes made by Oracle and Plaintiff;

        ii.   Failure to incorporate wildcard certificates that Plaintiff purchased and provided to Defendant and instead used its own certificate which, unbeknownst to Plaintiff, pointed the API endpoints to Defendant's own servers and expired July 6, 2021;

    e.   Failing to provide strategy planning for business and revenue model consulting, requirements gathering, architecture flow of data, or proper whiteboarding;

    f.   Failed to follow proper Industry Standards including, engagement in code reviews or code commenting, providing continuous review of latest coding standards and trends, providing, maintaining and preserving readability of the code developed;

    g.   Improper Project Management including failure to test project management and failure to submit bugs and issues; and

    h.   Performed untimely sprints including failing to complete and deliver a final Sprint Project product due on June 30, 2020 which should have included mobile applications for both iOS and Android, a completed Backoffice product, a completed progressive web application, and web portal.

21.    Schedule A of the Agreement required Defendant report directly to Matt Mathison with information regarding the Project which Defendant purposefully avoided by contacting other employees of Plaintiff.

22.    In addition the above-mentioned contractual obligations and related breaches, Defendant failed to maintain confidentiality when it:

    a.   Shared Plaintiff's confidential information with other entities who then used the information to develop a virtually identical product as the Project;

    b.   Employed and utilized software developers to draft lines of code in iOS and for API who were not employees of Defendant, who did not execute confidentiality agreements with Plaintiff, and who were unknown to Plaintiff;

    c.   Outsourced developers to work on Plaintiff's Back Office development without Plaintiff's knowledge or authorization; and

    d.   Outsourced two developers, Siva Dharmaraj and Rajesh Paraman, who work for and manage a company called Cloud Destinations to perform Plaintiff's migration

from Defendant's servers to Oracle's servers without Plaintiff's knowledge or authorization.

**D.** **Additional Tortious Conduct**

23.    Further, Defendant misrepresented that Plaintiff's Project was developed using Defendant's Flutter technology. On Wednesday, March 31, 2021 from 6:00-6:30 PM EST, Defendant hosted an event entitled, "Flutter - why do we love it? What is Flutter, Benefits, Use Case, Demonstration, and Q&A." During the course of this presentation, Sean Caputo and Defendant falsely misrepresented that it made a product with Flutter technology that was for professional athletes.

24.    Defendant made false statements to Plaintiff concerning Defendant's experience, capabilities, training in industry best practices, achievements, and programs when in negotiations with Plaintiff to engage in business together.

25.    Plaintiff requested Defendant remedy such breaches and tortious conduct in a Google Meet on January 27, 2021 between Cindy Alcivar and Matt Mathison, employees of Plaintiff, and Karthik Pichai, Sean Caputo, and Zachary Newton employees of Defendant.

26.    During the Google Meet Sean Caputo, speaking on behalf of Defendant, dictated that the Agreement's outstanding balance of the Agreement would be foregone and Defendant would fix the outstanding and major software issues and subsequently terminate the relationship.

27.    Defendant failed to address those outstanding, major software issues, causing Plaintiff to attempt to mitigate its damages and incur significant expenses and reputational damage directed toward the platform.

28.    Defendant improperly terminated the Agreement leaving Plaintiff without a completed product for its users, businesses, and investors.

E.      **Demand Letter**

29.      On or about October 1, 2021, Plaintiff made a demand to Defendant for monetary compensation for Defendant's various breaches, fraud, etc., and requested Defendant's response by October 12, 2021. Plaintiff attached a Notice and Demand for Preservation of Evidence to Augusta HiTech Soft Solutions, LLC, et al., to the demand letter.

30.      On or about October 21, 2021, Plaintiff discovered an additional partner and founder of Defendant, Jeffrey Kazmucha. Upon immediate discovery of Jeffrey Kazmucha's involvement, Plaintiff sent a copy of the October 1, 2021 demand letter to Kazmucha and Defendant, providing additional time for response. Plaintiff requested Defendant respond by October 29, 2021.

31.      Defendant did not and has not responded or made further efforts to communicate with Plaintiff. Additionally and in violation of the Notice and Demand for Preservation of Evidence, Defendant has since eliminated all references to Kazmucha on Defendant's website, marketing materials, and leadership.

32.      All conditions precedent to the commencement and maintenance of this action have been satisfied, performed, waived, or otherwise discharged.

**COUNT I**
**BREACH OF CONTRACT**

33.      Plaintiff alleges and incorporates by reference paragraphs 1 – 32 as though fully set forth herein.

34.      On or about November 25, 2019, Plaintiff and Defendant entered into a contract for consideration for the development of custom computer software for Plaintiff for the Project.

35.      Plaintiff performed all duties required under the Agreement including tender of substantial payment under the Agreement in the amount of $105,000.000.

36.     Despite receiving substantial payments under the Agreement, Defendant failed to complete its obligations under the Agreement including but not limited to, failure to complete the Deliverables or Architecture, failure to properly implement the Means and Methods, and disclosure of confidential information.

37.     Defendant's incomplete work and breach of the confidentiality provision caused a significant delay in product launch and loss of potential investors and business.

38.     As a result of Defendant's breach, plaintiff has suffered irreparable harm and monetary damages in excess of $1,917,182.00 for amounts paid, lost prospective economic advantage, loss of potential investors, lost revenue, and expenses.

**WHEREFORE**, Plaintiff, **SPRINGBOARD MEDIA, LLC,** demands judgment in its favor against Defendant, **AUGUSTA HITECH SOFT SOLUTIONS, LLC,** for breach of contract, attorney's fees for bringing this action, and for any such further relief this Court deems just.

## COUNT II
## BREACH OF IMPLIED COVENANTS OF
## GOOD FAITH AND FAIR DEALING

39.     Plaintiff alleges and incorporates by reference paragraphs 1 – 38 as though fully set forth herein.

40.     Plaintiff and Defendant entered into a valid and enforceable contract.

41.     The Agreement contained specific restrictive covenants that are enforceable against Defendant.

42.     In violation of the Agreement, Defendant shared confidential information with other entities, including Plaintiff's competitors who then used such confidential information to develop a virtually identical product.

10

43.     In violation of the Agreement, Defendant lied to Plaintiff about progress of the Project and bugs and issues to hide Defendant's inability to perform under the Agreement.

44.     In reliance on these lies, Plaintiff was unable to remedy the problems as they arose or make other plans in an effort to complete the Project on time.

45.     Florida law imposes a duty of good faith and fair dealing that requires Defendant to deal with Plaintiff with the utmost good faith and to deal fairly with Plaintiff in the implementation and execution of the Agreement.

46.     For the reasons set forth above, Defendant breached this duty to Plaintiff's detriment by intentionally violating the restrictive covenant contained in the Agreement.

47.     As a direct result of Defendant's breach of implied covenant of good faith and fair dealing Plaintiff has suffered and will continue to suffer irreparable harm and monetary damages for amounts paid, lost prospective economic advantage, loss of potential investors, lost revenue, and expenses.

**WHEREFORE**, Plaintiff, **SPRINGBOARD MEDIA, LLC,** demands judgment in its favor against Defendant, **AUGUSTA HITECH SOFT SOLUTIONS, LLC,** for breach of implied covenant of good faith and fair dealing, attorney's fees for bringing this action, and for any such further relief this Court deems just.

## COUNT III
## BEACH OF FIDUCIARY DUTY

48.     Plaintiff alleges and incorporates by reference paragraphs 1 – 47 as though fully set forth herein.

49.     Plaintiff and Defendant entered into a valid and enforceable contract that imposes a fiduciary duty of confidentiality in provision 11.

50.     Defendant's fiduciary duty of confidentiality required Defendant not disclose Plaintiff's confidential information.

51.     Defendant breached said fiduciary duty of confidentiality when it shared Plaintiff's confidential information with other entities, including Plaintiff's competitors.

52.     Defendant's fiduciary duty of confidentiality required Defendant not disclose Plaintiff's confidential information with third parties for the purposes of providing services under the Agreement without requiring the third parties to execute a confidentiality agreement.

53.     Defendant breached said fiduciary duty of confidentiality when Defendant employed outside software developers without notifying Plaintiff or requiring the outside developers execute a confidentiality agreement.

54.     As a direct result of Defendant's breach of fiduciary duty Plaintiff has suffered and will continue to suffer irreparable harm and monetary damages for amounts paid, lost prospective economic advantage, loss of potential investors, lost revenue, and expenses.

**WHEREFORE**, Plaintiff, **SPRINGBOARD MEDIA, LLC,** demands judgment in its favor against Defendant, **AUGUSTA HITECH SOFT SOLUTIONS, LLC,** for breach of fiduciary duty, attorney's fees for bringing this action, and for any such further relief this Court deems just.

### COUNT IV
### DISLOYALTY
### *(BREACH OF COMMON LAW DUTY OF LOYALTY)*

55.     Plaintiff alleges and incorporates by reference paragraphs 1 – 54 as though fully set forth herein.

56.     Plaintiff employed Defendant to complete services for the Project and as such, Defendant owed Plaintiff the common law duty of loyalty.

12

57.     Defendant's common law duty of loyalty required Defendant not use or communicate Plaintiff's confidential information for the employee's own purposes or those of a third party.

58.     Defendant breached said common law duty of loyalty when it shared Plaintiff's confidential information with other entities, including Plaintiff's competitors.

59.     Defendant's common law duty of loyalty required Defendant not to acquire a material benefit from a third party in connection with transactions conducted for Plaintiff.

60.     Defendant breached said common law duty of loyalty when Defendant hosted an event to promote its "Flutter" technology and falsely stated that the Flutter technology was used to create a product for professional athletes.

61.     At no time was Plaintiff or any part of the Project developed with the Flutter technology.

62.     As a direct result of Defendant's breach of common law duty of loyalty Plaintiff has suffered and will continue to suffer irreparable harm and monetary damages for amounts paid, lost prospective economic advantage, loss of potential investors, lost revenue, and expenses.

**WHEREFORE**, Plaintiff, **SPRINGBOARD MEDIA, LLC,** demands judgment in its favor against Defendant, **AUGUSTA HITECH SOFT SOLUTIONS, LLC,** for breach of common law duty of loyalty, attorney's fees for bringing this action, and for any such further relief this Court deems just.

### COUNT V
### TORTIOUS INTERFERENCE WITH CONTRACT

63.     Plaintiff alleges and incorporates by reference paragraphs 1 – 62 as though fully set forth herein.

64.     Plaintiff and third party cloud provider, Oracle, entered into a valid and enforceable contract.

65.     Defendant was aware of Plaintiff's contract with Oracle because Oracle was Plaintiff's chosen cloud provider and as part of Plaintiff's contract with Defendant, Defendant was to work with Oracle for the migration of Plaintiff's information between servers.

66.     Upon information and belief, Defendant for its own benefit intentionally, maliciously, and without any privilege to do so, prevented Springboard from working with Oracle to fix the very issues to the system and software caused by Defendant.

67.     Defendant's tortious interference with Plaintiff's contract was without justification.

68.     As a direct result of Defendant's tortious interference with Plaintiff's contract Plaintiff has suffered and will continue to suffer irreparable harm and monetary damages for amounts paid, lost prospective economic advantage, loss of potential investors, lost revenue, and expenses.

**WHEREFORE**, Plaintiff, **SPRINGBOARD MEDIA, LLC,** demands judgment in its favor against Defendant, **AUGUSTA HITECH SOFT SOLUTIONS, LLC,** for tortious interference with contract, attorney's fees for bringing this action, and for any such further relief this Court deems just.

**COUNT VI**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE**
**ECONOMIC ADVANTAGE**

69.     Plaintiff alleges and incorporates by reference paragraphs 1 – 68 as though fully set forth herein.

70.     Plaintiff contracted with Defendant to develop the computer software for the Project which Plaintiff would then use to retain investors and use the product on Plaintiff's social

media platform for business including but not limited to connecting professional athletes, brands, and sports enthusiasts.

71.     Defendant was fully aware of the purpose of its work for Plaintiff and for what Plaintiff needed the Project software.

72.     Defendant intentionally and willfully failed to complete its deliverable obligations, prevented Plaintiff from working with its cloud provider, Oracle, provided false progress reports, failed to provide strategy planning, shared confidential information with Plaintiff's competitors, caused mobile and back office platform outages, and publicly exposed Plaintiff to security breaches.

73.     Defendant's tortious interference with Plaintiff's prospective economic advantage was without justification.

74.     As a direct result of Defendant's tortious interference with Plaintiff's prospective economic advantage Plaintiff has suffered and will continue to suffer irreparable harm and monetary damages for amounts paid, lost prospective economic advantage, loss of potential investors, lost revenue, and expenses.

**WHEREFORE**, Plaintiff, **SPRINGBOARD MEDIA, LLC,** demands judgment in its favor against Defendant, **AUGUSTA HITECH SOFT SOLUTIONS, LLC,** for tortious interference with prospective economic advantage, attorney's fees for bringing this action, and for any such further relief this Court deems just.

**COUNT VII**
**CIVIL CONSPIRACY**

75.     Plaintiff alleges and incorporates by reference paragraphs 1 – 74 as though fully set forth herein.

76.     Defendant outsourced software developers without Plaintiff's authorization for work on the Project.

77.     Defendant and said outsourced developers agreed to engage in unlawful activity, including but not limited to:

      a.   Breach of contract;

      b.   Breach of implied covenants of good faith and fair dealing;

      c.   Breach of fiduciary duty;

      d.   Breach of common law duty of loyalty;

      e.   Tortious interference with Plaintiff's contract with Oracle;

      f.   Tortious interference with Plaintiff's prospective economic advantage;

      g.   Injurious falsehood;

      h.   Negligent falsehood;

      i.   Fraudulent misrepresentation;

      j.   Fraud;

      k.   Trade secret misappropriation;

      l.   Unfair competition; and

      m.   Unjust enrichment.

78.     Defendant and its outsourced developers acted in pursuance of the conspiracy when the developers drafted lines of code in iOS and API and worked on the Back Office development.

79.     As a direct result of Defendant's civil conspiracy Plaintiff has suffered and will continue to suffer irreparable harm and monetary damages for amounts paid, lost prospective economic advantage, loss of potential investors, lost revenue, and expenses.

**WHEREFORE**, Plaintiff, **SPRINGBOARD MEDIA, LLC,** demands judgment in its favor against Defendant, **AUGUSTA HITECH SOFT SOLUTIONS, LLC,** for civil conspiracy, attorney's fees for bringing this action, and for any such further relief this Court deems just.

**COUNT VIII**
**INJURIOUS FALSEHOOD**

80.    Plaintiff alleges and incorporates by reference paragraphs 1 – 79 as though fully set forth herein.

81.    Defendant hosted an event to promote its "Flutter" technology and falsely stated that the Flutter technology was used to create a product for professional athletes.

82.    At no time was Plaintiff or any part of the Project developed with the Flutter technology.

83.    Defendant knew or reasonably should have known that the falsely claiming that Plaintiff's Project was developed with Flutter technology would likely result in harm to Plaintiff.

84.    As a direct result of Defendant's injurious falsehood/slander of title Plaintiff has suffered and will continue to suffer irreparable harm and monetary damages for amounts paid, lost prospective economic advantage, lost revenue, and expenses.

**WHEREFORE**, Plaintiff, **SPRINGBOARD MEDIA, LLC,** demands judgment in its favor against Defendant, **AUGUSTA HITECH SOFT SOLUTIONS, LLC,** for injurious falsehood/slander of title, attorney's fees for bringing this action, and for any such further relief this Court deems just.

## COUNT IX
## <u>NEGLIGENT FALSEHOOD</u>

85.     Plaintiff alleges and incorporates by reference paragraphs 1 – 84 as though fully set forth he Defendant hosted an event to promote its "Flutter" technology and falsely stated that the Flutter technology was used to create a product for professional athletes.

86.     At no time was Plaintiff or any part of the Project developed with the Flutter technology.

87.     Defendant knew or reasonably should have known that the falsely claiming that Plaintiff's Project was developed with Flutter technology would likely result in harm to Plaintiff.

88.     As a direct result of Defendant's negligent falsehood/slander of title Plaintiff has suffered and will continue to suffer irreparable harm and monetary damages for amounts paid, lost prospective economic advantage, lost revenue, and expenses.

**WHEREFORE**, Plaintiff, **SPRINGBOARD MEDIA, LLC,** demands judgment in its favor against Defendant, **AUGUSTA HITECH SOFT SOLUTIONS, LLC,** for negligent falsehood, attorney's fees for bringing this action, and for any such further relief this Court deems just.

## COUNT X
## <u>FRAUDULENT MISREPRESENTATION</u>

89.     Plaintiff alleges and incorporates by reference paragraphs 1 – 88 as though fully set forth herein.

90.     Defendant made misrepresentations concerning its achievements, programs and abilities.

91.     Defendant made these misrepresentations with the intent of inducing Plaintiff to enter into a business and contractual relationship with Defendant.

92.     Defendant routinely provided progress reports containing material misrepresentations about the status of the Project development.

93.     Defendant made these misrepresentations with the intent of hiding its failure to perform under the Agreement from Plaintiff.

94.     Sean Caputo, acting on behalf of Defendant contacted Cindy Alcivar to provide falsehoods concerning the status of the Project for market release.

95.     Defendant made this representation to Cindy Alcivar instead of Matt Mathison as required under the Agreement with the knowledge that the Project was not ready for market.

96.      Plaintiff did in fact rely on Defendant's false misrepresentations when it entered into a contractual business relationship with Defendant and did not take prompt action to remedy Defendant's breaches as they occurred.

97.     As a direct result of Defendant's fraudulent misrepresentations Plaintiff has suffered and will continue to suffer irreparable harm and monetary damages for amounts paid, lost prospective economic advantage, loss of potential investors, lost revenue, and expenses.

**WHEREFORE**, Plaintiff, **SPRINGBOARD MEDIA, LLC,** demands judgment in its favor against Defendant, **AUGUSTA HITECH SOFT SOLUTIONS, LLC,** for fraudulent misrepresentation, attorney's fees for bringing this action, and for any such further relief this Court deems just.

## COUNT XI
## FRAUD

98.     Plaintiff alleges and incorporates by reference paragraphs 1 – 97 as though fully set forth herein.

99.     Defendant made false statements and promises to Plaintiff concerning Defendant's achievements, programs, abilities.

100.    Defendant made said false statements knowing them to be false with the intention that Plaintiff enter into a contractual business relationship with Defendant.

101.    Plaintiff entered into a contract with Defendant in reliance on Defendant's false statements.

102.    Defendant made false promises and statements concerning Defendant's work and progress on the Project.

103.    Defendant made said false statements knowing them to be false with the intention that Plaintiff remain within the contractual relationship with Defendant.

104.    Plaintiff entered into the Agreement with Defendant and continued to perform under the Agreement to its detriment in reliance on Defendant's false statements.

105.    As a direct result of Defendant's fraud Plaintiff has suffered and will continue to suffer irreparable harm and monetary damages for amounts paid, lost prospective economic advantage, loss of potential investors, lost revenue, and expenses.

**WHEREFORE**, Plaintiff, **SPRINGBOARD MEDIA, LLC,** demands judgment in its favor against Defendant, **AUGUSTA HITECH SOFT SOLUTIONS, LLC,** for fraud, attorney's fees for bringing this action, and for any such further relief this Court deems just.

**COUNT XII**
**Violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836**

106.    Plaintiff alleges and incorporates by reference paragraphs 1 – 105 as though fully set forth herein.

107.    Plaintiff possesses(ed) secretive information in the form of its prototypes and business models which it has created with significant expense and extensive effort.

108. Plaintiff took reasonable steps to protect the secrecy of this information by, among other things, requiring Defendant and anyone employed by Defendant to sign a confidentiality agreement.

109. Defendant acquired such information and documents concerning Plaintiff's prototypes and business model trade secrets under circumstances giving rise to Defendant's duty to maintain the secrecy of the same.

110. Defendant knew such information was secret and confidential and was expressly stated in the Agreement.

111. Defendant disclosed said trade secrets to other entities and Plaintiff's competitors who then used the information to develop a virtually identical product to Plaintiff.

112. As a direct result of Defendant's violation of the DTSA, Plaintiff has suffered and will continue to suffer irreparable harm and monetary damages for amounts paid, lost prospective economic advantage, loss of potential investors, lost revenue, and expenses.

113. Plaintiff is entitled to recover actual damages and damages for unjust enrichment under 18 U.S.C. § 1836.

**WHEREFORE**, Plaintiff, **SPRINGBOARD MEDIA, LLC,** demands judgment in its favor against Defendant, **AUGUSTA HITECH SOFT SOLUTIONS, LLC,** for violation of the, **DTSA, 18 U.S.C. § 1836,** attorney's fees for bringing this action, and for any such further relief this Court deems just.

## COUNT XIII
## <u>UNJUST ENRICHMENT</u>

114. Plaintiff alleges and incorporates by reference paragraphs 1 – 32 as though fully set forth herein.

115.    This is an action for unjust enrichment, brought in the alternative to Count I, in the event that the Court finds that there is no enforceable express contract.

116.    The  essential elements of unjust enrichment are "a benefit conferred on the defendant by the plaintiff, appreciation by the defendant of such benefit, and acceptance and retention by the defendant of such benefit." *Swindell v. Crowson,* 712 So.2d 1162, 1163 (Fla. 2d DCA 1998) (citing *Ruck Bros. Brick v. Kellogg & Kimsey,* 668 So.2d 205 (Fla. 2d DCA 1995)).

117.    Plaintiff conferred a benefit upon Defendant when Plaintiff made substantial payments to Defendant under the Agreement in the amount of $105,000.00.

118.    Defendant accepted and retained the benefit because Defendant is still in possession of the payments.

119.    As a result of Defendant retaining possession of the payment and its failure to deliver and complete the computer software required for the Project to Plaintiff for its retainment of the payment, Defendant has been unjustly enriched and have benefited to the damage, harm, and detriment of Plaintiff.

120.    The circumstances are such that it would be inequitable and unjust for Defendant to retain the benefit conferred by Plaintiff, unless compelled to pay Plaintiff the amount conferred upon Defendant minus reasonable value of Defendant's work actually conferred.

**WHEREFORE**, Plaintiff, **SPRINGBOARD MEDIA, LLC,** demands judgment in its favor against Defendant, **AUGUSTA HITECH SOFT SOLUTIONS, LLC,** for unjust enrichment, attorney's fees for bringing this action, and for any such further relief this Court deems just.

## **JURY DEMAND**

Plaintiff hereby requests and demands trial by jury on all claims so triable.

DATED: January 14, 2022.                    Respectfully submitted,

**SAUL EWING ARNSTEIN & LEHR LLP**
*Attorneys for the Plaintiff*
701 Brickell Avenue, 17th Floor
Miami, Florida 33131
Telephone: (305) 428-4500
Email Addresses:
Angela.decespedes@saul.com
Hilda.piloto@saul.com
Samuel@bardoni-cowley@saul.com
Annie.rosenthal@saul.com
Aida.McLaughlin@saul.com
MIA-ctdocs@saul.com

By: /s/ Angela de Cespedes, Esq.
          Angela de Cespedes, Esq.
          Florida Bar No. 623571
          Hilda Piloto, Esq.
          Florida Bar No. 154120
          Samuel Bordoni-Cowley, Esq.
          Florida Bar No. 1028596
          Annie Rosenthal, Esq.
          Florida Bar No. 1031335

# EXHIBIT A

# NON-DISCLOSURE AGREEMENT

**THIS AGREEMENT** is made on          [          8/22/2019                                    ]

## BETWEEN

1. **Springboard Media, LLC and its subsidiaries [the Disclosing Party],**; and

2. ___Karthik Pichai_____ **[the Receiving Party],** (the "Receiving Party"), collectively referred to as the "Parties".

## RECITALS

A. The Receiving Party understands that the Disclosing Party has disclosed or may disclose information relating to the above referenced projects and intellectual property, which to the extent previously, presently, or subsequently disclosed to the Receiving Party is hereinafter referred to as "Proprietary Information" of the Disclosing Party.

## OPERATIVE PROVISIONS

1. In consideration of the disclosure of Proprietary Information by the Disclosing Party, the Receiving Party hereby agrees: (i) to hold the Proprietary Information in strict confidence and to take all reasonable precautions to protect such Proprietary Information (including, without limitation, all precautions the Receiving Party employs with respect to its own confidential materials), (ii) not to disclose any such Proprietary Information or any information derived therefrom to any third person, (iii) not to make any use whatsoever at any time of such Proprietary

DocuSign Envelope ID: 261872C5-C9790-4E5E-8249-C525D43B4575

Information except to evaluate internally its relationship with the Disclosing Party, and (iv) not to copy or reverse engineer any such Proprietary Information. The Receiving Party shall procure that its employees, agents and sub-contractors to whom Proprietary Information is disclosed or who have access to Proprietary Information sign a nondisclosure or similar agreement in content substantially similar to this Agreement

2. Without granting any right or license, the Disclosing Party agrees that the foregoing shall not apply with respect to any information after five years following the disclosure thereof or any information that the Receiving Party can document (i) is or becomes (through no improper action or inaction by the Receiving Party or any affiliate, agent, consultant or employee) generally available to the public, or (ii) was in its possession or known by it prior to receipt from the Disclosing Party as evidenced in writing, except to the extent that such information was unlawfully appropriated, or (iii) was rightfully disclosed to it by a third party, or (iv) was independently developed without use of any Proprietary Information of the Disclosing Party. The Receiving Party may make disclosures required by law or court order provided the Receiving Party uses diligent reasonable efforts to limit disclosure and has allowed the Disclosing Party to seek a protective order.

3. Immediately upon the written request by the Disclosing Party at any time, the Receiving Party will return to the Disclosing Party all Proprietary Information and all documents or media containing any such Proprietary

DocuSign Envelope ID: 261872C5-29790-4E5E-9249-C525DA3B4F75

Information and any and all copies or extracts thereof, save that where such Proprietary Information is a form incapable of return or has been copied or transcribed into another document, it shall be destroyed or erased, as appropriate.

4.  The Receiving Party understands that nothing herein (i) requires the disclosure of any Proprietary Information or (ii) requires the Disclosing Party to proceed with any transaction or relationship.

5.  The Receiving Party further acknowledges and agrees that no representation or warranty, express or implied, is or will be made, and no responsibility or liability is or will be accepted by the Disclosing Party, or by any of its respective directors, officers, employees, agents or advisers, as to, or in relation to, the accuracy of completeness of any Proprietary Information made available to the Receiving Party or its advisers; it is responsible for making its own evaluation of such Proprietary Information.

6.  The failure of either party to enforce its rights under this Agreement at any time for any period shall not be construed as a waiver of such rights. If any part, term or provision of this Agreement is held to be illegal or unenforceable neither the validity, nor enforceability of the remainder of this Agreement shall be affected. Neither Party shall assign or transfer all or any part of its rights under this Agreement without the consent of the other

Party. This Agreement may not be amended for any other reason without the prior written agreement of both Parties. This Agreement constitutes the entire understanding between the Parties relating to the subject matter hereof unless any representation or warranty made about this Agreement was made fraudulently and, save as may be expressly referred to or referenced herein, supersedes all prior representations, writings, negotiations or understandings with respect hereto.

7. This Agreement shall be governed by the laws of the jurisdiction of Miami Dade County , Florida (the "Territory") and the parties agree to submit disputes arising out of or in connection with this Agreement to the non-exclusive of the courts in the Territory.

8.

**[Disclosing Party]**

By: _____
DocuSigned by:
8AA230D8D02549C...

Name: _____
Cynthia Alcivar

Title: _____
CEO

Address: _____

Date: _____
8/22/2019

**[Receiving Party]**

By: _____
DocuSigned by:
karthik Pichai
FE42B3FB5B2E407...

Name: _____
Karthik Pichai

Title: _____
CEO

Address: _____

Date: _____
8/22/2019

# EXHIBIT B



# Consulting Services Agreement

This Agreement is entered into as of the **11/18/2019**, between **Springboard Media, LLC (Federal ID# - 83-2556993)** ("Company"). Located at **9011 SW 69th CT, Pinecrest, FL 33156** and **Augusta Hitech Soft Solutions, LLC (Federal ID# 46-1253742)** ("Developer") located at **5700 Granite Parkway, Suite # 940, Plano, TX 75024, United States,** Subject to the terms and conditions of this Agreement, the Company hereby engages the Developer to provide Developers to perform the services set forth herein, and the Developer hereby accepts such engagement. (Developer and Company hereinafter referred to individually as a "**Party**" or collectively as "**Parties**").

## RECITALS

**WHEREAS**, Developer is engaged in the business of computer application development, including technical consulting services, software development and maintenance;

**WHEREAS**, Company wishes to retain Developer as an independent Developer to develop the computer software described herein;

**WHEREAS** Developer wishes to develop and sell, and Company wishes to purchase, the Software (as defined herein);

**NOW, THEREFORE**, in consideration of the premises and mutual covenants contained herein and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## AGREEMENT

1. **Scope of Services**. Developer shall design, develop, implement and sell to Buyer a custom software application (the "**Software**") based on the functional specifications and related information, if any, set forth in the Project Specifications Offer (hereinafter, "**Statement of Work**" or "**Schedule A**"), attached hereto as **Schedule A**. Developer shall perform the services described in the Statement of Work (the "**Services**") in order to develop and implement the Software according to the specifications and completion times set forth therein. Company shall cooperate with Developer's reasonable requests for any information and data necessary for the completion of the Software. Company understands and acknowledges that completion of the Software may be dependent, in part or in whole, upon Company's provision of certain information, data, specifications, or content and that any delay in the provision of such information may delay the completion of the Software.

   (a) **Written Reports:** The Company may request that progress reports be provided by Developer on a daily or weekly basis and Developer shall submit via email if so required. If required, a final results report shall be due at the conclusion of the project and shall be submitted to the Company in a confidential written report at such time. All reports required by Company from Developer shall be reasonable in relation to detail and description of information and data, but shall not exceed two (2) pages in length unless deemed reasonable by the Developer.

   (b) **Production and Project file format:** Company requires and Developer agrees that Developer must be and is able to receive and review from Company project information in any and all of the following formats: Microsoft word docs and Microsoft Excel files.

   (c) **Communication:** Company and Developer agree that Developer will be available for communication from Company via email, telephone, online instant messaging, or other mutually agreeable method within reasonable working hours which at a minimum shall run from Monday-Friday, 9am-5pm.

2. **Precedence**. In the event of any conflict related to ownership, Intellectual Property rights, or other clauses between this Agreement and the Statement of Work, this Agreement shall prevail.

3. **Modifications**. Modifications to the Software specifications shall be considered on a case-by-case basis. If at any time following execution of this Agreement Company desires any modifications, additions, changes or updates to the Software that fall outside the scope of the specifications set forth in the Statement of Work, Company shall submit a written request for such changes to Developer. As soon as reasonably possible following Developer's receipt of

DocuSign Envelope ID: E62B3976-1A81-4B3E-B502-90A552532F96



AUGUSTA

request, Developer shall deliver to Company a new quote including any changes to the price, payment deadlines, deliverables timelines and other relevant information (the **"Modification Quote"**)

    a. Acceptance of Modification Quote. If Company deems the terms contained in the Modification Quote acceptable, the Company shall indicate its agreement in writing and the Modification Quote shall be attached as an Addendum to this Agreement and its terms shall be incorporated by reference. Company understands and acknowledges that Developer will not begin work on any of the changes contained in the Modification Quote until the Developer receives Company's written acceptance of the terms contained in the Modification Quote.

    b. Rejection of Modification Quote. If Company deems the terms contained in the Modification Quote unacceptable, the Company shall notify Developer of the rejection as soon as reasonably possible but not later than five (5) days from Company's receipt of the Modification Quote so that Developer may continue work on the Software as originally contemplated in the Statement of Work. The rejection of a Modification Quote shall have no impact on this Agreement and each Party shall remain responsible for its obligations under this Agreement as executed.

4. **Artwork and Content**. Unless otherwise agreed in the Statement of Work, Company agrees to acquire and provide to Developer all images, logos, and textual descriptions for use in the Software (the **"Content"**). The Content shall be delivered in the file format set forth in the Statement of Work. Company acknowledges and agrees any delays in delivering the Content may lead to delays in development of the Software, and Company agrees to hold Developer harmless for any such delays. Company further acknowledges and understands that by delivering the content to Developer Company is warranting and representing that Company has the lawful right to utilize the Content in the Software, and is agreeing, pursuant to Section 13 herein, to indemnify and hold harmless Developer against any and all claims that may arise out of or relating to the use of the Content in furtherance of this Agreement.

5. **Price and Payment Terms**.

    a. Payment balance. The first payment of $25,000.00 is due on the date of signing of the Agreement. The remaining balance of $100,000; or $75,000.00, provided that partial payment of $25,000.00 is tendered on or before December 31, 2019, shall be made payable on or before February 25th, 2020.

    b. Fixed Fee. The Developer's performance of the Services shall be subject to a fixed fee stated in the Statement of Work.

    c. Invoices. Developer shall deliver an invoice (**"Invoice"**) to Company on the schedule set out in the Statement of Work.

    d. Late Payments. Payments shall be received by Developer no later than thirty (30) days from the date that the payment became due. Any payments received more than thirty (30) days from the date that payment became due shall be deemed a "**Late Payment**" and shall be levied a $500 late fee penalty and accrue interest at the statutory rate or twelve percent (12%) per annum, whichever is greater, until paid in full.

    e. Development Conditional upon Timely Payment. Company acknowledges and understands that Developer's continued performance of the Services, including development of the Software, is conditioned upon timely receipt of payments in accordance with the payment schedule set forth in this Section 5, and that Developer may, in its sole discretion, determine not to perform any further Services until all Invoices are paid in full.

6. **Term and Termination**.

    a. **Term**. The term commences on the Effective Date and shall continue to Post- Completion (as defined in Schedule A attached hereto), unless sooner terminated in accordance with termination provisions set forth in this Section 6 (the **"Term"**).

    b. Termination by Company. Company may terminate this Agreement at any time by giving Developer thirty (30) days written notice PROVIDED, HOWEVER, that Company shall compensate Developer for the work Developer

has performed on the Software including any work performed since the last payment was due or made.

   c. Termination by Developer. Developer may terminate the Agreement only for Cause (as defined herein). Upon termination by Developer for Cause, Company shall be responsible for compensating Developer for the work Developer has performed on the Software including any work performed since the last payment was due or made. The following events shall constitute **"Cause":**

   d. Failure by Company to remit any payment owed Developer within ninety (90) days from the date such payment became due (such a termination a **"Late Payment Termination"**);

   o Any other material breach of this Agreement by Company;

   o Any repeated non-cooperation by Company which materially impacts Developer's ability to perform its obligations under this Agreement and which is not cured within fifteen (15) days upon receipt of written notice.

   e. Termination Invoice. Upon receipt of a termination notice from Company, or along with Developer's termination notice to Company, Developer shall immediately cease all provision of the Services and shall deliver to Company an invoice (the **"Termination Invoice"**) for the amount owed for work performed since the last payment (the **"Termination Payment"**). The Termination Payment shall estimate the actual work performed by Developer as precisely as possible and Developer's method of estimating the Termination Payment amount shall be set forth in the Termination Invoice. The Termination Payment shall be due immediately upon receipt of the Termination Invoice.

7. **Ownership of Software**. Upon Company's payment in full of the Termination Payment title and interest in and to the incomplete Software as it then exists excepting any portions which are Background Technology (as defined herein) (the **"Incomplete Software"**), all throughout the universe for the full period of such rights including all renewals and extensions thereof, including all patents, copyrights, trade secrets, other proprietary rights and all rights of exploitation, shall be automatically assigned and transferred to Company. If to any extent any of the aforesaid rights, title or interests are vested in Developer, Developer hereby irrevocably agrees that such rights, title or interests shall be immediately assigned by Developer to Company on the terms set forth above. In the event of a termination that is not a Late Payment Termination, upon Company's payment in full of the Termination Payment, Developer grants to Company for no further consideration an irrevocable, non-exclusive, perpetual, transferable (and assignable without consent), sub-licensable (to any tier), worldwide, fully paid-up royalty-free license to use, reproduce, adapt, exploit in any way (as part of the Incomplete Software and any derivative thereof) and create (and own) adaptations and/or derivative works of the Background Technology as it is incorporated into Incomplete Software (and any derivative thereof), and all updates and revisions thereto, including for the purposes of completing the Software with a third party.

8. **Ownership of Software**. Developer agrees that the development of the Software is for the benefit of Company and that, upon Completion and full payment in accordance with Section 5 above, Company shall solely own all rights, title and interest in and to the Software as a whole, excepting the Background Technology (as that term is defined herein), all throughout the universe for the full period of such rights including all renewals and extensions thereof, including all patents, copyrights, trade secrets, other proprietary rights and all rights of exploitation. For the sake of clarity, the Software will be considered "works made for hire" to the extent permitted under the United States Copyright Act. Company will own all United States and international copyrights, inventions, patents, trade secrets and other intellectual property rights in, arising out of or relating to the Software (excepting the Background Technology). If to any extent any of the aforesaid rights, title or interests are vested in Developer, Developer hereby irrevocably agrees that such rights, title or interests shall be immediately and automatically assigned by Developer to Company on the terms set forth above.

9. **Ownership of Background Technology.** Company acknowledges and understands that Developer owns or holds all rights and/or licenses to use and sublicense various preexisting common methods, application program interfaces, development tools, routines, subroutines and other programs, data and materials that Developer may include in the Software, and which is specified in Attachment 2 to the Statement of Work below. This material shall be referred to as **"Background Technology"**. Developer retains all right, title and interest, including all copyright, patent rights and trade secret rights in the Background Technology. Subject to full payment in accordance with Section 5, Deve

DocuSign Envelope ID: E62B3970-1A81-4B3E-8502-99A552532F06

AUGUSTA

grants to Company an irrevocable, nonexclusive, perpetual worldwide, transferable (and assignable without consent), fully paid-up royalty-free license to use, reproduce, adapt, exploit in any way (as part of the Software and any derivative thereof) and create (and own) adaptations and/or derivative works of the Background Technology as it is incorporated into the Software developed for and delivered to Company under this Agreement (and any derivative thereof), and all updates and revisions thereto. However, Company shall make no other use of the Background Technology without Developer's written consent, and shall make no use of the Background Technology in any context other than as it is incorporated into the Software as delivered to Company without Developer's written consent, which consent shall not be unreasonably withheld.

10. **Portfolio Rights**. Company hereby agrees to allow Developer to feature the final Software, including screen shots, Company's name, name of the Software, description of the Software, and a link to enable purchase of the Software if applicable, as part of the Developer's portfolio of work and for Developer's commercial and promotional purposes. Company may opt-out of this provision at any time by providing written notice to Developer requesting that the Software no longer be used for Developer's promotional purposes.

11. **Confidentiality.** The Developer acknowledges that during the engagement Developer will have access to and become acquainted with various trade secrets, inventions, innovations, processes, information, records and specifications owned or licensed by the Company and/or used by the Company in connection with the operation of its business including, without limitation, the Company's business and product processes, marketing and sales processes and methods, prospect and Company lists, accounts and procedures. The Developer agrees that Developer will not disclose any of the aforesaid, directly or indirectly, or use any of them in any manner either during the term of this Agreement or at any time thereafter, except as required in order to provide the Services specified in this Agreement. All files, records, documents, blueprints, specifications, information, letters, notes, media lists, original artwork/creative, notebooks, and similar items relating to the business of the Company, whether prepared by the Developer or otherwise coming into Developers possession, shall remain the exclusive property of the Company. Developer shall not retain any copies of the foregoing without the Company's prior written permission. Upon the expiration or earlier termination of this Agreement, or whenever requested by the Company, the Developer shall immediately deliver to the Company all such files, records, documents, specifications, information, and other items in Developers possession or under Developers control, including copies of any such material. Developer agrees that Developer will not use the information furnished for any purpose other than as stated above, and agrees that Developer will not either directly or indirectly by agent, employee, or representative, disclose this information, either in whole or in part, to any third party except as provided for in this Agreement; provided, however that information furnished may be disclosed only to those associates, affiliates, colleagues and acquaintances of Developer and to Developer's advisors or representatives who need such information for the purpose of providing the Services hereunder (it being understood that those colleagues, advisors and representatives shall be informed by Developer of the confidential nature of such information and shall be directed by Developer to execute a Confidentiality Agreement with Company and to treat such information confidentially). Developer further agrees that Developer will not contact, communicate, or in any way communicate with Company's customers or prospective customers without the prior written consent of the Company and shall at all times preserve the confidential nature of Developers relationship to the Company and of the services hereunder.

12. **Non-Solicitation**. Company agrees that Company will not contact, communicate, solicit, or in any way communicate with Developer's employees, temporary employees, or partner companies without the prior written consent of the Developer. Company agrees it will not for its own benefit, or for the benefit of any other person or entity, directly or indirectly solicit any employee, temporary employee, or Developer of the Company to resign employment with the Developer for any purpose whatsoever including the purpose of competing with the Developer, or for the purpose of providing services to others which are similar to the services marketed, sold, or provided by the Developer. Developer agrees that Developer will not contact, communicate, or in any way communicate with Company's employees, temporary employees, or contractors without the prior written consent of the Company and shall at all times preserve the confidential nature of Developer's relationship to the Company and of the services hereunder; Developer agrees it will not for its own benefit, or for the benefit of any other person or entity, directly or indirectly solicit any employee, temporary employee, or Developer of the Company to resign employment with the Company for any purpose whatsoever including the purpose of competing with the Company, or for the purpose of providing services to other which are similar to the services marketed, sold, or provided by the Company.

DocuSign Envelope ID: E62B3976-1A81-4B3E-8502-90A552532F06

AUGUSTA

13. **Warranty and Disclaimer.** Developer warrants that for a period of thirty (30) days following Completion (the **"Warranty Period"**) the Software will operate substantially according to the specifications set forth in the Statement of Work on the operating system version upon which the Software is initially published. For purposes of clarity, any i) manufacturer- provided update to the operating system upon which the Software is initially published or ii) manufacturer-provided update to any device upon which a user is operating the Software which operating system or device update renders the Software unable to operate substantially according to the specifications set forth in the Statement of Work shall be outside the scope of this warranty and shall not be a breach of, or a covered repair under, this Section 13. In the event of a breach of the warranty in this Section 13, Developer shall take all action necessary at its expense to cause the Software to operate according to the warranty. Company must report any material deficiencies in the Software to Developer in writing within thirty (30) days of Company's receipt of the Software. THIS WARRANTY IS EXCLUSIVE AND IS IN LIEU OF ALL OTHER WARRANTIES, WHETHER EXPRESS OR IMPLIED, INCLUDING ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE AND ANY ORAL OR WRITTEN REPRESENTATIONS, PROPOSALS OR STATEMENTS MADE ON OR PRIOR TO THE EFFECTIVE DATE OF THIS AGREEMENT. DEVELOPER EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES.

14. **Limitation of Liability, Indemnification**.

   a. Company agrees that it shall indemnify, defend, save and hold harmless Developer from any and all demands, liabilities, losses, costs and claims including reasonable attorneys' fees (collectively "Liabilities") asserted against Developer, personally, Cynthia Alcivar, its contracted providers, agents, servants, officers and employees, and it is successors and assigns for liabilities arising out of (i) any material supplied by Company causing any injury to any person or property; (ii) any material supplied by Company actually or allegedly infringing, misappropriating or otherwise violating the Intellectual Property Rights of a third party; (iii) Intellectual Property Right infringement claims arising out of third party software with which Developer assists Company at Company's request; or (iv) Company's modification of work product provided by Developer.

   b. Developer agrees that it shall indemnify, defend, save and hold harmless Company (its affiliates and its and their officers, directors, agents, representatives, co-branders or other partners and employees, successors and assigns) from any Liabilities arising out of claims that Company's use (as permitted hereunder) of the Software that actually or allegedly infringes, misappropriates, or otherwise violates the Intellectual Property Rights of a third party. Developer shall have no obligation to indemnify Company under this Section to the extent that Liabilities arise from (i) the Company Content, (ii) derivative works of the Software created by Company, (iii) use of the Software in combination with non-Developer approved third party products, including hardware and software, (iv) failure of Company to implement any improvement or updates to the Software, if the infringement claim would have been avoided by the use of the improvement or updates.

   c. Any indemnity under this Amendment shall apply only provided that the indemnified party must: (i) promptly notify the indemnifying party of details of the claim; and (ii) not make any admission in relation to the claim; and (iii) allow the indemnifying party to have the conduct of the defense or settlement of the claim; and (iv) give the indemnifying party all reasonable assistance (at the indemnifying party's expense) in dealing with the claim. No indemnity under this Amendment or the Original Agreements will apply to the extent that the claim arises as a result of the indemnified party's negligence, willful damage or breach of the Agreement.

   d. Notwithstanding anything to the contrary contained herein, each party hereby expressly waives its right to recover from, and to obtain a judgment against, the other party for any indirect, consequential, special, exemplary, or punitive damages (including, without limitation, damages based on lost profits) caused by breach or default by such other party under this Agreement.



DocuSign Envelope ID: E62B3978-1A91-483E-B502-99A552532F06



15. **Survival of Limitation of Liability and Indemnification**. The Limitation of Liability and Indemnification provisions contained in Section 14 of this Agreement shall survive termination of this Agreement by either Party, and shall survive termination by any other means than election by either Party, including termination by court order. **The limitations of liability set forth in Section 14**Error! Reference source not found. **shall not apply with respect to (1) damages, fines, penalties, deficiencies, losses, liabilities (including settlements and judgments) and expenses (including interest, court costs, and attorneys' fees) suffered, incurred, or sustained by a party occasioned by (a) the fraud, willful misconduct or gross negligence of the other Party or its agents or (b) any breach of the other party's obligations under Sections 8, 11, or 12, or (2) amounts paid with respect to third party claims that are the subject of indemnification under this Agreement.**

16. **Miscellaneous Provisions.**

    a. **Mediation, Arbitration.** If a dispute arises under this Agreement, the Parties agree to first try to resolve the dispute with the help of a mutually agreed-upon mediator located in Plano Texas. Any costs and fees other than attorney fees associated with the mediation shall be shared equally between the parties.

    b. If it proves impossible to arrive at a mutually satisfactory solution through mediation, the Parties agree to submit the dispute to binding arbitration in Collin County, Texas under the rules of the American Arbitration Association. Judgment upon the award rendered by the arbitrator may be entered in any court with jurisdiction to do so. On the written request of either Party for arbitration of such a claim pursuant to this paragraph, the Parties shall both be deemed to have waived the right to litigate the claim in any federal or state court. To the extent that any claim or controversy arising out of this Agreement cannot be submitted to arbitration as set forth above, each Party hereby agrees that any suit, action or proceeding with respect to this Agreement and any transactions relating hereto, shall be brought in Collin County, Texas and each of the Parties hereby irrevocably consents and submits to the jurisdiction of such Court(s) for the purpose of any such suit, action or proceeding. Each of the Parties hereby waives and agrees not to assert, by way of motion, as a defense or otherwise, in any such suit, action or proceeding, any claim that it (he) is not personally subject to the jurisdiction of such Court; and, to the extent permitted by applicable law, any claim that such suit, action or proceeding is brought in an inconvenient forum or that the venue of such suit, action or proceeding is improper or that this Agreement or any replacements hereof may not be enforced by such Court(s).

    c. **Choice of Law.** This Agreement and its application shall be governed by the laws of the State of Florida without reference to principles of conflict of law. Jurisdiction and venue shall be limited to Miami-Dade, County. Pursuant to this Agreement, Company and Provider hereby consent to the jurisdiction of any or all of the following courts for purposes of resolving any dispute in Miami-Dade County, Florida. The Company and the Executive further agree that any service of process or notice requirements in any such proceeding shall be satisfied if the rules of such court relating thereto have been substantially satisfied. The Company and the Executive hereby waive, to the fullest extent permitted by applicable law, any objection which it or he may now or hereafter have to such jurisdiction and any defense of inconvenient forum.

    d. **Injunctive Relief.** In the event of a breach or threatened breach by the either party of Sections 7, 8, 11 or 12 of this Agreement, both parties hereby consent and agree that the other party shall be entitled to seek, in addition to other available remedies, a temporary or permanent injunction or other equitable relief against such breach or threatened breach from any court of competent jurisdiction, without the necessity of showing any actual damages or that money damages would not afford an adequate remedy, and without the necessity of posting any bond or other security. The aforementioned equitable relief shall be in addition to, not in lieu of, legal remedies, monetary damages, or other available forms of relief.

    e. **Notices.** Whenever in this Agreement one Party is required to give notice to the other Party, such notice may be given personally, by first class mail registered or certified, postage prepaid, or by electronic means including facsimile or electronic- mail. Electronic communications shall be considered "written" for purposes of this Agreement.

    f. **Severability.** If any provision of this Agreement should be held to be invalid or unenforceable, then such invalidity or unenforceability shall not affect the other provisions of this Agreement which shall remain in full force and



effect and shall not be in any way affected or impaired. The Parties agree to attempt to substitute for any invalid or unenforceable provision a valid or enforceable provision which achieves to the greatest extent possible the same effect as would have been achieved by the invalid or unenforceable provision.

g. **Waiver.** No failure or delay on the part of any of the Parties relating to the exercise of any right, power, privilege, or remedy provided under this Agreement shall operate as a waiver of such right, power, privilege, or remedy nor as a waiver of any preceding or succeeding breach by the other Party, nor shall any single or partial exercise of any right, power, privilege or remedy preclude any other or further exercise of such or any other right, power, privilege or remedy provided in this Agreement, all of which are several and cumulative and are not exclusive of each other or of any other rights or remedies otherwise available to a Party at law or in equity. No waiver shall be valid unless in writing and signed by both Parties or their duly authorized representatives.

h. **Assignability.** Neither Party may assign its rights or obligations under this Agreement to any other person without the written consent of the other Party, and any purported assignment in contravention of this Section shall be of no force or effect.

i. **Entire Agreement.** This Agreement constitutes the entire agreement and understanding of the Parties and supersedes all prior oral or written agreements, understandings or arrangements between them relating to the subject matter of this Agreement. No variation to this Agreement may be made except in writing signed by duly authorized representatives of both Parties.

j. **Relationship.** Nothing contained in this Agreement shall constitute or imply a partnership, joint venture, agency, or fiduciary relationship between the Parties.

k. **Counterparts.** This Agreement may be signed in any number of counterparts, all of which taken together shall constitute one and the same instrument. Any Party may enter into this Agreement by signing any such counterpart and each counterpart shall be as valid and effectual as if executed as an original.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement as of the date first written above.

**Developer: Augusta Hitech Soft Solutions, LLC**

*Karthik Pichai*

Signature  Karthik Pichai (Nov 18, 2019)

NAME: _Karthik Pichai_

**(Name of Signatory of Consulting Company)**

TITLE: _CEO_

**(Title)**

DATE: _Nov 18, 2019_

**(Execution Date)**

**Company: Springboard Media, LLC**

Signature

NAME: _Cynthia Alcivar_

**(Name of Signatory of Company)**

TITLE: _CEO_

**(Title- must be Vice President or higher)**

DATE: _11/25/2019_

**(Execution Date)**



# STATEMENT OF WORK - SCHEDULE A

**Duties:**
**See Schedule B**
**REPORTING:**

Augusta HiTech Soft Solutions, LLC ("Developer") will report directly to____Matt Mathison_____and to any other
employee of **Springboard Media, LLC** ("Company") designated in writing by Company in connection with the job being
performed under this SOW – Schedule B and shall fulfil any other duties reasonably requested by the Company and agreed
to by Augusta Hitech Soft Solutions, LLC ("Developer").

**TERMS:**

✓   The Company agrees to pay the Developer (Augusta Hitech Soft Solutions, LLC) as per the compensation and
      payment schedule/terms mentioned below.

✓   In any event, the Company or Developer can terminate this agreement by giving 30 day's notice. Payment Upon
      Termination: The Company will pay Developer for all Services performed by Developer through the date of
      termination. Company's termination of this agreement shall not relieve the Company's obligation to pay Developer
      for any work performed.

**COMPANY NAME:** Springboard Media, LLC
**PROJECT NAME:** GER MVP Product Development
**TOTAL COMPENSATION:** $ 225,000.00
**(Note: Augusta equity in exchange for development services in the amount of $100,000.00 will be defind in a seperate**
**agreement)**
**PAYMENT TERMS:** Due Upon Receipt
**PROJECT START DATE:** 11/21/2019
**DURATION:** 160 - 190 days of development after building BRD, SRS, Prototype, Design and Company sign-off of the
documents.

## PAYMENT SCHEDULE/TERMS WITH BASIC PROPOSAL

1. The 1st payment $25,000.00 is due on contract signing.
2. The 2nd payment $25,000.00 is due on or before December 31st, 2019.  (Refer to 5a Payment terms)
3. The balance 3rd payment $75,000.00 is due on February 24th, 2020.

## Important Project Terms:

1.   Once an Augusta Software Requirements Specification (SRS) document, prototype document, and design document
      has been signed any material changes in project scope, feature, functionality, text, font, color, image or content will
      result in a Change Request (CR) being raised and an additional charge.
2.   If approved by Augusta, any company branding design work such as logos, brochures, screenshots, videos, banners,
      images, app store images, or other marketing materials which are not specifically detailed in Proposal or Statement
      of Work (SOW) shall incur an additional charge.
3.   Any integration with a third party application, API, tool or utility which is not specifically detailed in the proposal,
      SOW or SRS shall incur an additional charge.
4.   Any additional work required due to future and/or unknown updates to mobile operating systems, computer
      operating systems, third-party applications or API's, social media sites, web browsers, or any other third-party
      solution share incur an additional charge.



**Important Invoice & Payment Terms:**

1. No payment for invoices due upon receipt will be delayed for bug testing, the action or inaction of a third-party company, code reviews, or any other issue outside the control of the Developer.
2. Payment terms are as outlined under payment terms above.

**Important Hosting and Infrastructure Terms:**

1. If your company requires and elects to have Augusta HiTech Soft Solutions LLC provision a hosting and cloud infrastructure account, an initial monthly invoice will be raised and due upon receipt once the account is setup. Recurring invoices will be due upon receipt on the 1st of every month.
2. The setup and provisioning of a <u>single</u> web server or cloud instance will not incur a one-time setup cost.
3. The setup and provisioning of any combination of multiple web servers, cloud instances, load balancers, hardware firewalls, database servers or any other advanced infrastructure shall incur a one-time setup cost.



DocuSign Envelope ID: E62B3976-1A81-483E-B502-90A552532F06



# STATEMENT OF WORK - SCHEDULE B

## The Objective:

To build a minimum viable product for GĒR as a progressive web application in addition to iOS and Android applications for supported mobile devices. GĒR is an up and coming social media platform centered around youth, amateur, and professional sports, that allows persona's to build a brand and show which equipment and accessories they prefer to use to compete at a high level. Persona will also be able to showcase memorabilia and game-worn accessories they have acquired from professional athletes in their locker. MVP will have functioning front end/back end systems and utilize the prototype provided by the GĒR team to build out the UI/UX infrastructure and desired functionality. Although this will be a comprehensive minimum viable product, it is not designed to go to market as a final product.

## High Level Overview

- Mobile Application, Progressive Web App and Web Portal.
- Create Backoffice for user management, admin management, basic reports.
- The estimated price is from reviewing the inVision Wireframe & Prototype : https://projects.invisionapp.com/d/main#/projects
- Stated of Work will be created when client creates MVP document requirements.
- UI/UX design for Mobile and Web Application.
- Software Architecture, Hardware Infrastructure Architecture, and Database Architecture.
- Development, Testing and Production Environment.
- Business Analysis, Project Manager, UI/UX Design Team, UI Engineer, iOS and Android Team, Full Stack API Team, Database Developer, Infrastructure Team, Quality and Assurance Team.

Note: This is a high-level overview of the product. The Software Requirements Document and Functional Requirements Document will show a step by step process of the application associated with wireframe



DocuSign Envelope ID: E62B3976-1A81-493E-B502-90A552532F06



## Augusta Strategy:

### Innovation as a Service

**Wherever your journey starts, chances are we've already navigated the territory.**

We believe that our Augusta team, and their combined skill sets, is our biggest differentiator. You will not find a more experienced team of expert technologists. Each of our key executives has 25 plus years of business and technical knowledge that spans across multiple industries. We function as your domain consultants and advisors.

Scope Out Your Project:

Strategy planning, consulting and technical scoping sessions included: <u>1 Hour</u>

- Brainstorming business strategy
- Business and revenue model consulting
- Requirements gathering
- Architect the flow of data through the process
- Whiteboarding
- Software stack surrounding API framework
- Hardware architecture stack
- API Management tool for outside connectivity and management
- Cloud Service for deploying technology
- Micro Services for scalability and modular components

**Important Note\*:** If the hours needed for strategic planning, consulting and technical scoping sessions exceed the hours listed above Augusta will bill the customer for additional hours at a rate of $120/hour to be added to the final invoice.

## The Process:

Nothing separates Augusta more from its competitors than our process

### Best practices and industry standards

All development, engineer, design and QA team members are continuously trained in Augusta and industry best practices.

- Continuous review of the latest coding standards and trends
- Proper programming styles and naming conventions
- Agile coding standards and processes
- Code reviews
- Detailed code commenting
- Maintainability and readability of the code
- Continuous review of the latest design standards and trends
- User interface design consistency
- Latest usability design principles
- Clear and concise unit testing



DocuSign Envelope ID: E62B3979-1A81-483E-B502-89A552532E06



- Test early test often the principle

## Streamlined Project Management

Augusta employs a state of the art web and mobile-based project management system that helps us streamline collaboration. The system brings our development, design, QA and project management teams together on a common platform with the client.

- Manage project communications from the web or mobile app
- Submit bugs and issues
- Get complete visibility into project status
- Email and mobile notification alerts
- Invite your company team members to collaborate
- Track tasks, bugs, and issues in real time
- Upload documents and files

## DevOps

Augusta's DevOps enforces communication, collaboration, integration, and automation to remove bottlenecks in software development and ensures agile delivery for software-driven innovation.

- Continuous builds and Integration
- Automated functional, load and security testing
- Improve code quality with automated SonarCube scans
- A single click or continuous deployment
- Source Code Version Control
- Continuous testing
- Reduces human error

## Detailed technical documentation

The Augusta project management team will create detailed documents to scope out and capture the exact technical requirements of the client.

- SOW/BRD - Business Executive Summary of Product Outcome.
- SRS - The core software requirements specification document is used to create the application. This is a step by step document from start to finish. including business process, outcome, functionality
- Business Analyst will write the document from notes created from Innovation as a Service Team. This document will be signed off before we start creating the Prototype and development of the application.
- Software and Hardware Stack design is created from both documents based on the scale, demand and infrastructure needs
- Whiteboard diagrams
- Data and user flow diagrams
- Presentation of cloud infrastructure suggestions.
- Security architecture review and analysis
- Mind mapping of the process flow.



DocuSign Envelope ID: E62B3976-1A81-483E-B502-90A552532F06



## Prototyping

Our expert UI/UX designers work to turn your ideas into reality
The Augusta design team will create a detailed functional prototype.

- Created from the documented SOW/BRD, SRS, Whiteboards and Mind mapping.
- Analyze and create the user experience.
- Low fidelity black and white prototype of the user experience.
- The client can review the prototype on their mobile devices.
- The client can review any web assets around application.
- Prototype sign off by the customer will kick off the sprints of product development.
- Quality and Assurance team start building UAT testing for testing automation, security testing coding compliance, UX testing and performance.

## Development, Sprints, Testing, and Bugs

Augusta has a specific development process

- Kick off meeting created by Director of Product Management with Team Leads
- Design kick off with Boca Raton UI/UX Team
- The client will review the design and sign off; the development team will integrate portions of the design associated with corresponding sprints
- Sprints are available in project management software called Zoho
- The client will have access to each finalized sprint to test the product with completed functionality associated with the corresponding sprint
- The client will have access to the project management portal and will receive reports on project status
- Each sprint will go through developer UAT testing and Quality Assurance testing

## Deployment

**We are cloud infrastructure experts**
Once complete, the Augusta expert team of engineers will deploy the application or software to the ideal cloud infrastructure solution (Extra costs may be applicable*)

- Augusta will present multiple hardware stack options to the client based on their specific requirements and budget.
- Augusta will create hardware stack upon vendor selection.
- Augusta will deploy the application on to the infrastructure and test application to meet our standard requirements implemented for performance, security, and scalability.

**Important Note*:** One-time setup and deployment of the application on a single cloud virtual machine are included. Any enterprise level infrastructure provisioning with single or multiple cloud virtual machines, load balancer, firewall or any other advanced setup will incur an additional setup fee and costs. Ongoing monthly costs are paid by the customer.

DocuSign Envelope ID: E62B3978-1A81-4B3E-B502-99A552532E96



## Optional Ongoing Support

We provide ongoing technical support to some of the world's leading platforms
If needed, Augusta offers software and hardware support contracts:

- ▪ Software Support
- ▪ Hardware Support

## Important Terms and Concepts

- **Client Consulting** and Flushing Out the Idea - help create the best product possible.
- **Change Request -** When the client requests a change outside the scope of the signed off SRS, prototype or design. Extra charges will incur.
- **Business Requirement Document** - created by Business Analysts. This document creates a reference to the goals and the business use of the application. Help the Quality and Assurance team create use cases for testing.
- **Software Requirement Solutions Document** - created by Business Analysts. The SRS will be referenced by the developers, Q&A, and Prototyping team. This document holds all the information around the application.
- **Prototyping Phase** - Black and White functional prototype of the application. If the application is mobile, the client can use in their mobile device. If the application is .com, then the client is provided a link. The prototype helps the client see a finished rendition of their product. Changes to flow and the process can be made quickly without impacting the development cycle. The development team refers to the prototype for functionality and the designer uses the prototype to create the design of the application. The prototype also helps the data architect better understand the flow of data from the database.
- **Infrastructure for Hardware and Software Stack** - Creating a diagram of the software and hardware stack. Software stacks are based on client application needs, budget, preference, integration with other technologies. We will give you our expert recommendation.
- **Data Modeling and Architecture** - The secret sauce to the successful user experience. Data modeling is very important for midsize to larger applications. The model sets the flow of information from the data to the end user. Creating the structure of tables and how they are connected to each other is very important. Many applications fail to handle the growth of user inputs and search because the modeling was not satisfactory to the needs of the BRD.
- **Design and UX/UI** - Our team will help you create an amazing experience for the end user. Augusta is not a marketing company, but an engineering company. We understand complete and fully functional products. The Design team will review the prototype and consult with the client to create the vision.
- **Agile Product Development Environment** - The application development is broken into sprints with time measured milestones. Clients will receive reports and beta downloads of the product with kickoff meetings and sprint completion meetings. The team will demonstrate the sprint to the client. The client can work with the sprint. The development team will send to the Q&A team.
- **Use Cases with Quality Assurance** - We use automated and manual testing. This has increased our quality and testing for optimization and performance of the application on a sprint by sprint level. Bugs will be found and fixed at this stage.
- **Setup and Installation of the product** - We will have our expert team set up the hosting, install the application and submit the apps to the appropriate app stores. Initial setup on one cloud instance is included. Enterprise level infrastructure provisioning will incur extra charges.

DocuSign Envelope ID: E62B3976-1A81-4B3E-B502-90A552532F06



# Development Timeline Estimation

The initial estimate for a timeline is from the date of the approved and signed SRS and prototype. Once the detailed SRS and prototype are approved, Augusta will release a delivery plan with sprints and milestones. Development timeline estimate **<u>after</u>** all strategy meetings, scoping, technical documentation and prototyping are complete:

Estimated Development Timeline: * 160 - 190 days *

**Important Note\*** This estimated timeline could be adjusted up or down based on additional information gathered during the SRS and prototype phase and any additional client change requests that are introduced.

## Project Assumptions

For Augusta to complete the project on time the following assumptions are made.

- The client is responsible for collaborating with Augusta's business analysis team.
- The client is responsible for including all stakeholders in the project.
- The client is responsible for providing any applicable or required text, images, content, and API documentation in a timely manner.
- Augusta will provide collaboration tools to complete the SRS documentation.
- Augusta is responsible for scheduling online or offline meetings with stakeholders.
- Augusta is responsible for Business Analysis, Project Manager, and Software Architect and Development Team.
- The client must engage in the prototyping and design process and sign off on each phase of the product creation.
- Augusta will create the Dev, QA environment for the product.
- To meet development timelines collaboration, documentation, meetings, sign-offs, and payments need to be handled within 48 hours of requests.

## Project Exclusions

- 3rd Party Auditing and Compliance
- Augusta cannot guarantee deliverability or performance of hosting, payment gateways or third party vendors and API's.
- Go to Market Strategy
- Logo design and company branding
- Non-user interface design or image creation
- App store screenshot or branding design
- Content text writing
- Third party API or application training
- Enterprise level advanced infrastructure setup
- The third party licensed photos or images
- Apple and Google App store marketing design assets





AUGUSTA

## Proposed Budget
### Pricing Estimation

| Resources | | | Days | Cost |
|---|---|---|---|---|
| | | | | |
| Estimated SOW Fixed Budget | | | 160-190 | $225,000 |
| | | | | |

## Acceptance:

The client named below verifies that the terms of this Statement of Work are acceptable. The parties hereto are each acting with proper authority by their respective companies

**Developer: Augusta Hitech Soft Solutions, LLC**     **Company: Springboard Media, LLC**

Signature    *Karthik Pichai*
Karthik Pichai (Nov 18, 2019)

NAME:   Karthik Pichai

Signature    [DocuSigned by:]
8AA230D8D02549C...
Cynthia Alcivar

NAME: _____

**(Name of Signatory of Consulting Company)**     **(Name of Signatory of Company)**

TITLE: _ CEO

TITLE: _____  CEO

**(Title)**     **(Title- must be Vice President or higher)**

DATE: _ Nov 18, 2019

DATE: _____  11/25/2019

**(Execution Date)**     **(Execution Date)**